A02A2038. MAYNOR v. THE STATE.
(570 SE2d 428)

BLACKBURN, Chief Judge.

Timothy Wayne Maynor was convicted by a jury on two counts of aggravated assault, possession of a firearm during commission of a felony, and simple battery.[1] This appeal followed. Maynor contends that there was insufficient evidence to convict him on the aggravated assault counts because the victims did not see him fire the rifle and did not know there were gunshots until after they were fired. He also contends that he did not intend to injure anyone. Therefore, he argues, the trial court erred in denying his motion for directed verdict on all counts except simple battery. We affirm.

"The same standard of review applies to the enumeration of error for the denial of the motion for directed verdict and to the enumeration of error for the sufficiency of the evidence, so we will consider these enumerations together." *Cloyd v. State.*[2]

We view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. We address only the sufficiency of the evidence, and we do not weigh the evidence or determine the credibility of the witnesses. As long as there is some evi-

---

[1] Maynor does not appeal his simple battery conviction.
[2] *Cloyd v. State*, 237 Ga. App. 608 (1) (516 SE2d 103) (1999).

dence, even though contradicted, to support each necessary element of the State's case, the jury's verdict will be upheld.

*Carter v. State*.[3] See also *Jackson v. Virginia*.[4]

So construing the evidence, the record reveals that on January 17, 2001, Maynor entered Warren's Custom Sound store and after yelling that 19-year-old Robert Walden owed him some money, he punched Walden in the face and then left.[5] Walden had formerly worked for Maynor. Maynor had also resided across the street from the home Walden shared with his father; his mother, J. B.; and his brother, Z. B., until Maynor had moved recently because of a divorce action.

The next morning, Maynor stood in the driveway of his former residence and fired four to five shots into Walden's residence. Walden and his father were not at home, but there was a truck parked on the property and Walden's mother and brother were at home. Both J. B. and Z. B. were fearful at the time of the attack. Z. B. was scared to leave his room, and J. B. was afraid to get out of her bed in case the shooting continued. Her fears were confirmed when she crawled into the bathroom and saw the bullet holes. The police began an investigation in response to J. B.'s call, and a slug was found in the attic and shell casings were found across the street near the former residence of Maynor. J. B. told the police that Maynor had attacked her son the previous day, and he was the only one she could think of who might have shot at her house.

Following an investigation, the police charged Maynor for hitting Walden with his fist on January 17, 2001, and for shooting at J. B.'s residence on January 18, 2001. Maynor had fled the scene after the shooting and had disposed of the .30 caliber Carbine rifle a few miles away in a wooded area. The rifle was ultimately recovered by students picking up trash along the roadway. Ballistics testing by the Georgia Bureau of Investigation confirmed that it was the rifle which had fired the shots into J. B.'s residence. Maynor acknowledged ownership of the subject rifle.

Maynor was indicted on the above counts, and at trial he admitted having struck Robert Walden with his fist and having fired gunshots into his family's residence because he was upset with the whole family. He testified that he was drinking heavily during this period because he was upset at having gone through a divorce. He felt that the Waldens had taken advantage of him during that period by

---

[3] *Carter v. State*, 246 Ga. App. 891 (1) (543 SE2d 42) (2000).

[4] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[5] Maynor is not appealing the simple battery conviction which was based on this incident.

purchasing several thousand dollars worth of items for a minimal sum. He also admitted that there were bad feelings between himself and Walden's family..

Maynor acknowledged that he had seen the truck parked next to the house at the time of the shooting. He also told Jeremy Browning about the incident, and in response to Jeremy's inquiry as to who was home, Maynor stated, "I don't care. I hope they were. I hope I hit them."

We first address Maynor's contention that the evidence was insufficient to support a conviction for aggravated assault, and that the trial court erred in denying his motion for directed verdict.

The offense of aggravated assault under OCGA § 16-5-21 has two essential elements: (1) that a simple assault under OCGA § 16-5-20 was committed on the victim and (2) that it was aggravated by (a) an intention to murder, rape, or rob, or (b) use of a deadly weapon as provided in OCGA § 16-5-21, or (c) the unlawful discharge of a firearm from within a motor vehicle toward a person as provided in OCGA § 16-5-21 (a) (3).

This case involves aggravated assault with the use of a deadly weapon. As is relevant here, OCGA § 16-5-21 (a) (2) provides that aggravated assault is complete when a simple assault is committed "[w]ith a deadly weapon . . . which, when used offensively against a person, is likely to . . . result in serious bodily injury." See *Williams v. State*.[6]

Unlike an aggravated assault committed with the intent to murder, rape, or rob, aggravated assault with a deadly weapon which is likely to result in serious bodily injury does not require a specific criminal intent; rather, it requires only a general criminal intent as defined in OCGA § 16-2-1, which in the case of simple assault under OCGA § 16-5-20 (a) (1) is a general intent to injure. See *Cline v. State*.[7] General intent to injure may be proven by circumstantial evidence and is a question of fact for the trier of fact to determine. See generally OCGA § 16-2-6; *Daughtry v. State*.[8]

The existence of criminal intent may be inferred by the trier of fact "upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted." OCGA § 16-2-6. The trier of fact may infer, if it wishes to do so, that a person of sound mind and discretion intends the natural and probable consequences of his knowing acts. Whether any such inference is made is solely a matter within the factfinder's

---

[6] *Williams v. State*, 208 Ga. App. 12, 13 (430 SE2d 157) (1993).
[7] *Cline v. State*, 199 Ga. App. 532 (405 SE2d 524) (1991).
[8] *Daughtry v. State*, 180 Ga. App. 711, 712 (1) (350 SE2d 53) (1986).

discretion, and any such inference is rebuttable. See *Parker v. State*.[9]

Simple assault, which is an essential element of aggravated assault, is either an attempted battery type under OCGA § 16-5-20 (a) (1), which addresses a situation where one "[a]ttempts to commit a violent injury to the person of another," or a reasonable apprehension of harm type, under OCGA § 16-5-20 (a) (2), which addresses a situation where one "[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury."

The focus of an attempted battery type of simple assault under OCGA § 16-5-20 (a) (1), involving the use of a deadly weapon, is the intention of the perpetrator to seriously injure the victim, rather than the reasonable apprehension that the victim might feel. It requires only a general criminal intent to injure, as that is an element of simple assault under OCGA § 16-5-20 (a) (1). Simple battery under OCGA § 16-5-23 (a) (2) provides for the offense where one "[i]ntentionally causes physical harm to another." See *Cline*, supra.

The focus of a reasonable apprehension of harm type of simple assault, under OCGA § 16-5-20 (a) (2), is on the apprehension of the victim. There is no specific intent requirement in the statute, which would indicate that only an intent to commit the act which in fact places another in reasonable apprehension of injury is required, not a specific intent to cause such apprehension.

Maynor, having admitted that he fired a deadly weapon at the victims' residence, limits his argument to the elements of simple assault. He argues that the victims were not placed in a reasonable apprehension of receiving an immediate violent injury, because they did not see him shooting the rifle, did not see any projectiles coming toward the home, and did not know that the sounds that they heard were gunshots until after the firing had ended.

Maynor relies on *Motes v. State*[10] and *Merrell v. State*.[11] We note that *Motes*, a felony murder case, cannot be properly cited as authority in this court. *Motes* was not a three-judge opinion, as Judge Beasley did not concur in Division 2, the relevant portion of the case on which Maynor relies. *Motes* is factually distinguishable in any event. *Merrell* is also factually distinguishable. In *Merrell*, supra, the victim was in her home at the time a shotgun blast injured several people outside. There was no evidence that Nellie Cruse was the targeted or actual victim of the deadly assault as required for an attempted battery assault, and the sole evidence of reasonable apprehension of violent injury was her testimony that "she heard what sounded like a shot outside but did not know that it was one." Id. at 887 (2). This

[9] *Parker v. State*, 256 Ga. 363, 365 (1) (349 SE2d 379) (1986).
[10] *Motes v. State*, 192 Ga. App. 302 (384 SE2d 463) (1989).
[11] *Merrell v. State*, 162 Ga. App. 886 (293 SE2d 474) (1982).

Court held that the evidence in that case was insufficient to support a reasonable apprehension of harm assault from the sound she heard and reversed the defendant's conviction of aggravated assault.

In contrast, in the present case, the victims' testimony clearly establishes reasonable apprehension of harm. While J. B. testified that she did not believe the first shot was a gun firing, she realized she was under attack when the shots hit her house. The mother testified that once she knew that it was gunfire, she was scared to get out of bed since she did not know whether someone might continue shooting at the house. Further, she testified that when she called her son, he would not come to her in the bathroom because he was scared. The son testified that while he was in his own bedroom, "I heard gunshots, and I heard something hit the house, which I guess I thought was a bullet." At that point, he stated he was pretty shaken and thought that someone was shooting at the house. Clearly, the victims' conduct in remaining in their rooms while they heard four or five gunshots, coupled with their testimony concerning their emotional states at that time, was ample evidence of reasonable apprehension of harm from the multiple gunshots.

Maynor argues that the victims were not sure that it was gunshots that they heard until the last shot hit the house, and by that time the incident had been concluded. This fact is of no consequence. The evidence clearly shows that the victims' apprehension was a result of Maynor's actions and was contemporaneous to those acts.

Maynor also argues that his acts were merely reckless or negligent conduct because he was unaware that anyone was inside the victims' home when he fired the rifle and that he had no intent to harm anyone. Given the fact that he fired into the residence of an individual whom he had physically attacked the day before, with knowledge that there were several people residing there, including a child, that the shooting occurred at 10:30 a.m., with a truck parked at the residence, and given his later comment to Jeremy that "I hope I hit them," which coupled with his admission that there were bad feelings between himself and the entire family, authorized a jury to determine that he was guilty of aggravated assault on each of the two victims who were in the home at the time of the shooting. This evidence would also authorize the jury to determine that Maynor did indeed intend to injure any family member who was in the house at the time he fired the rifle.

While Maynor correctly argues that negligence cannot substitute for criminal intent in either form of assault, the evidence here authorizes a jury determination that his acts were intentional, rather than negligent or merely reckless. The evidence further authorizes the jury to find Maynor guilty of aggravated assault upon both J. B. and Z. B. An assault committed by means of a deadly weapon requires

only a general criminal intent to injure in an attempted battery type assault, as that is an element of the offense. Proof of the use of deadly force with the intention of seriously injuring the victim is sufficient to support a conviction for an attempted battery assault. *Cline*, supra.

A general intent to injure is not a necessary element in a reasonable apprehension type of simple assault. Proof of the defendant's use of a deadly weapon which placed the victims in reasonable apprehension of immediately receiving a violent injury would be sufficient for conviction. It is the intention to commit the act of using the deadly weapon that must be shown, not the intention to make the victims apprehensive.

> [P]ursuant to the express language of [OCGA § 16-5-20] (a) (2), an assault under that subsection looks to the victim's state of mind, rather than the accused's, to establish the elements of an assault. There is an intent of the accused that must be shown, but it is only the criminal intent to commit the acts which caused the victim to be reasonably apprehensive of receiving a violent injury, not any underlying intent of the accused in assaulting the victim.

*Dunagan v. State.*[12]

The evidence here supported Maynor's conviction of aggravated assault utilizing either theory of simple assault. Having affirmed Maynor's felony convictions, it follows that his conviction of possession of a firearm during the commission of a felony was also appropriately supported by the evidence.

*Judgment affirmed. Johnson, P. J., and Miller, J., concur.*

DECIDED AUGUST 22, 2002.

*Turner & Willis, Christopher W. Willis*, for appellant.
*Lydia J. Sartain, District Attorney, Jason J. Deal, Lindsay H. Messick, Assistant District Attorneys*, for appellee.

---

[12] *Dunagan v. State*, 269 Ga. 590, 594 (2) (b) (502 SE2d 726) (1998).