**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BRANCH and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 12, 2018**

# In the Court of Appeals of Georgia

A17A1413. HUGHES v. THE STATE.

A17A1414. HARRIS v. THE STATE.

BETHEL, Judge.

Christian Hughes and Blaise Harris were indicted and tried jointly[1] on two counts of armed robbery and three counts of aggravated assault stemming from a late-evening robbery of a pizzeria. They now appeal from their convictions and the denial of their motions for new trial. In Case No. A17A1413, Hughes argues that the State did not present sufficient evidence to support the charges against him and that he received ineffective assistance of counsel because his trial counsel did not move to

---

[1] A third defendant was also indicted in this case. That defendant, according to the State's theory, served as the getaway driver for the robbery of the pizzeria. At trial, he testified regarding his relationship with Hughes and Harris and his role in the events leading up to and following the incident at the pizzeria. However, he was not tried with Hughes and Harris, and his case is not part of this appeal.

suppress certain evidence obtained after his arrest. In Case No. A17A1414, Harris also challenges the sufficiency of the evidence presented against him, and he argues that he received ineffective assistance of counsel because his trial counsel did not call a particular witness that could have established an alibi. For the reasons set forth below, we affirm.

On appeal, a defendant "is no longer presumed innocent and all of the evidence is to be viewed in the light most favorable to the jury verdict." *Batten v. State*, 295 Ga. 442, 443 (1) (761 SE2d 70) (2014) (citation omitted). So viewed, the evidence as presented at trial shows that on the evening of December 11, 2013, shortly before 11:00 pm, two men entered a pizzeria in Gwinnett County. The first man wore a letterman-style jacket, covered his face with a black ski mask, and carried a revolver, while the second man covered his face with a red and gold Iron Man[2] Halloween mask and carried a set of brass knuckles.[3]

_____

[2] Iron Man is a fictional action superhero appearing in comic books published by Marvel Comics and numerous motion picture adaptations. Due to its success in these media, Iron Man has also spawned a wide-ranging merchandising opportunity for its rights holders, which no doubt led to the retail availability of the mask involved in this incident.

[3] We note that the object was a folded knife, the handle of which featured a set of brass knuckles. Because the record reflects that the object in question was used to punch one of the victims with the brass knuckles, we have referred to the object as

During an altercation with employees, the man wearing the Iron Man mask struck one of the employees with the brass knuckles, resulting in a gash to the victim's head. The same man then took that employee's cell phone. Both assailants then demanded money from a second employee and took money from a cash register. The man wearing the ski mask and the letterman jacket repeatedly asked the employees, "No one wants to die tonight, right?" One of the employees testified that he was in fear of losing his life or being injured during the time he was being held at gun point and threatened by the two assailants. The two assailants left the restaurant with the cash and the cell phone they had taken.

Another witness, a third employee of the pizzeria, ran out of the restaurant toward nearby businesses to seek assistance. A person he encountered outside called 9-1-1 to report the incident. While outside, the employee observed multiple people getting into a white Dodge vehicle which then drove away. The employee provided a description of the vehicle to police.

The police dispatch provided the vehicle description to officers in the area around 11:00 pm. Moments later, a police officer stopped a white Dodge Charger in

brass knuckles for purposes of clarity, as there was no evidence that the knife portion of the object was deployed or was used to stab or cut.

response to the call. The vehicle was only occupied by the driver, but the arresting officer noticed a set of brass knuckles and an Iron Man mask inside the vehicle. The driver of the vehicle was wearing a letterman jacket.

The driver was taken into custody, and the police drove him to the pizzeria so they could ask witnesses if they had seen him during the incident (the "show up"). On the way to the show up, unsolicited by the officer, the driver asked "Is this where the robbery happened?" and whether the officers had "caught the other two guys." After arriving at the pizzeria for the show up, two employees of the pizzeria that were asked could not identify the driver's face because he had been masked, but they did recognize his clothes as the letterman jacket worn by the assailant who was carrying the gun and covering his face with the ski mask.

At trial, the State called the driver as a witness. In his trial testimony, the driver stated that he drove Hughes and Harris and dropped them off near the pizzeria. They returned to his car five or ten minutes later, and Harris told him that they had robbed the pizzeria. After driving away from the pizzeria, he dropped off Harris and Hughes at Harris's car, which was parked closeby. The driver stated that he had purchased the Iron Man mask just before the robbery at the direction of Harris and that the brass

4

knuckles belonged to Harris. He also stated that Hughes owned a letterman jacket similar to his and that Hughes was wearing his own jacket the night of the robbery.

After the driver's arrest, pursuant to a search warrant, police searched the Dodge Charger. The police took fingerprints from the outside of the car, one of which matched Harris's fingerprints. Police also took a black ski mask, an Iron Man Halloween mask, a revolver, and a set of brass knuckles from the vehicle. The black ski mask was submitted to the Georgia Bureau of Investigation ("GBI") for DNA analysis. A GBI analyst testified at trial that the DNA profile taken from the ski mask matched a buccal swab of Hughes taken by the police.[4] Trial testimony regarding analysis of cell phone records[5] showed that calls placed from Harris's phone both before and after the robbery were routed through a cell tower in the vicinity of the pizzeria.

---

[4] A buccal swab is a swab of the tissue on the inside of the cheek. The swab collects epithelial cells from the inside of the subject's mouth to be tested for DNA matching. In this case, buccal swabs were taken from Harris, Hughes, and the driver, but the only buccal swab that matched DNA samples taken from the Dodge Charger belonged to Hughes.

[5] Harris and the State stipulated that the phone identified with those records belonged to Harris at the time of the incident giving rise to this case.

Following a jury trial, Hughes and Harris were convicted on all counts. Both filed motions for new trial, which were denied following hearings. This appeal followed.

1. Hughes and Harris first argue that the evidence presented by the State was insufficient to support guilty verdicts on each of the counts against them. We disagree.

(a) As an initial matter, we note that there was conflicting evidence regarding the identity of Harris and Hughes and their roles in the incident at the pizzeria. Both Harris and Hughes suggested below and on appeal that the testimony of the driver, who the State believed to be their accomplice in committing these acts, was insufficient as a matter of law to sustain their convictions because his testimony was not corroborated by other evidence presented by the State. We disagree.

OCGA § 24-14-8 provides, in relevant part, that

> [t]he testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness[.]

"The sufficiency of the corroborating evidence is a matter for the jury, and if the verdict is based upon the slightest evidence of corroboration connecting an accused to a crime, even if it is circumstantial, it is legally sufficient." *Reynolds v. State*, 267 Ga. App. 148, 151 (3) (598 SE2d 868) (2004) (punctuation and footnote omitted). "The corroboration need not be sufficient to warrant a guilty verdict or prove every material element of the crime; it need only tend to connect and identify the defendant with the crime charged." *Id*. (footnote and punctuation omitted). "The amount of corroborative extraneous evidence necessary to connect the accused with the commission of the offense lies peculiarly within the province of the factfinder." *Daniels v. State*, 306 Ga. App. 577, 581 (1) (703 SE2d 41) (2010) (citation omitted).

Here, in addition to the driver's testimony, the testimony of the two store employees and DNA evidence presented by the State allowed the jury to infer that, during the robbery of the pizzeria, Hughes was wearing a black ski mask and a letterman-style jacket and carrying a revolver while Harris was dressed in an Iron Man mask and carrying a set of brass knuckles. Based on the evidence presented by the State, we are satisfied that the State established the roles of both Hughes and Harris in this incident and that it presented sufficient evidence to corroborate the testimony presented by their accomplice, the driver. *See Love v. State*, 318 Ga. App.

7

387, 390 (734 SE2d 95) (2012) (sufficient corroboration where second witness's identification of clothes assailant was wearing matched description given by accomplice). We now consider the sufficiency of the evidence presented by the State as to each charge in the indictment.

(b) Counts 1 and 2 of the indictment alleged that Hughes and Harris committed two counts of armed robbery when they stole cash and a cell phone from the store employees in the pizzeria through the use of a handgun. OCGA § 16-8-41 (a) provides that "[a] person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon[.]" OCGA § 16-2-20 (a) provides that "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (b) (3) further provides that "[a] person is concerned in the commission of a crime only if he . . . [i]ntentionally aids or abets in the commission of the crime[.]"

In this case, the evidence established that Hughes was in possession of a firearm when he entered the pizzeria. Testimony from the store employees established that Hughes used that weapon to demand cash from one employee who was standing at the store register and the cell phone of a second employee, both of which were then

8

taken. The evidence was therefore sufficient to establish both counts of armed robbery against Hughes.

The evidence also established that Harris was a party to these offenses. Where "another individual was the actual perpetrator of the armed robbery, mere presence at the scene will not establish that the defendant was a party to the crime. Proof that the defendant shares a common criminal intent with the actual perpetrator is necessary, and may be inferred from the defendant's conduct before, during, and after the crime." *Jamale v. State*, 302 Ga. App. 140, 142 (1) (a) (690 SE2d 420) (2010) (citation omitted). Here, the evidence established that Harris directed the driver to purchase the Iron Man mask that was used later in the evening to commit the robbery. The evidence also established that Harris was in the pizzeria, that he participated in demanding money from the employees, and that he took the cell phone of one of the employees. He also admitted to the driver moments later that he and Hughes had robbed the pizzeria. This evidence established Harris's criminal intent and his role in the robbery.

(c) Counts 3, 4, and 5 of the indictment allege that Hughes and Harris each committed three counts of aggravated assault when Hughes pointed his firearm at two store employees and when Harris struck one of the employees with his brass

9

knuckles. OCGA § 16-5-20 (a) provides that "[a] person commits the offense of simple assault when he or she either . . . [a]ttempts to commit a violent injury to the person of another [or c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-21 (a) (2) provides that "[a] person commits the offense of aggravated assault when he or she assaults . . . [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]"

As to Count 3 and 4, the evidence established that Hughes pointed his handgun at two store employees. One of the employees testified that the act of pointing the gun at him, along with the verbal threats made by the assailants, caused him to fear that he would be injured or killed. The other employee, who had already been struck with the brass knuckles wielded by Harris, noted that the gunman asked, "No one wants to die tonight, right?" A jury could thus infer that these acts placed both employees in reasonable apprehension of receiving a violent injury.

As with the acts of armed robbery described above, Harris was a party to these aggravated assaults, as he aided and abetted Hughes in committing the offenses. *See Robinson v. State*, 246 Ga. App 576, 577-78 (1) (541 SE2d 660) (2000) (even though

10

defendant did not actually use the weapon named in indictment, accomplice's use of that weapon can be attributed to defendant where defendant, among other acts, threatened victim and demanded money from him). The evidence presented was therefore sufficient to convict both Harris and Hughes on Counts 3 and 4.

As to Count 5, the evidence established that Harris struck the other store employee with his brass knuckles. Brass knuckles are traditionally utilized as a weapon in close hand-to-hand fighting and when used offensively, as here, can result in serious injury to the victim, as they are designed to augment the force of a punch. When used as Harris did during the incident in the pizzeria, the jury was authorized to find that brass knuckles qualify, at a minimum, as an object, device, or instrumentality that is likely to cause serious bodily injury.

The evidence of Harris's use of the brass knuckles satisfied both theories of simple assault in that the jury could infer that the act of striking the employee with the knuckles was both an attempt to commit a violent injury against the employee and that the act placed the employee in immediate apprehension of violent injury. *See Maynor v. State*, 257 Ga. App. 151, 153 (570 SE2d 428) (2002) ("[A]ggravated assault with a deadly weapon which is likely to result in serious bodily injury does not require a specific criminal intent; rather, it requires only a general criminal intent

11

. . . which . . . is a general intent to injure."). As Hughes was party to Harris's use of the brass knuckles against the employee, mainly in that he also brandished a weapon and made threatening statements to the employee and others present in the pizzeria, the evidence was sufficient to establish the guilt of both Harris and Hughes for this offense. *See Robinson*, 246 Ga. App at 577-78 (1).

2. Hughes argues that the buccal swab taken from him was the result of an arrest warrant that should not have been issued due to a lack of probable cause to charge him with the armed robbery and aggravated assault at the pizzeria. Hughes argues that he received ineffective assistance of counsel because his trial counsel did not move to suppress evidence from the buccal swab based on the allegedly unlawful arrest. We disagree.

To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was professionally deficient and that, but for such deficient performance, there is a reasonable probability that the result of the trial would have been different. *See Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LEd2d 674) (1984).

> A court considering a claim of ineffective assistance must apply a strong
> presumption that counsel's representation was within the wide range of

reasonable professional assistance. Further, in evaluating deficient performance, the proper inquiry is focused on what the lawyer did or did not do, not what he thought or did not think, as hindsight has no place in an assessment of the performance of trial counsel.

*Pittman v. State*, 300 Ga. 894, 898 (2) (799 SE2d 215) (2017) (citations and punctuation omitted). In reviewing the trial court's decision, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012) (citation omitted).

In this case, the lead detective conducted a series of interviews with the driver of the getaway vehicle shortly after his arrest. In one of those interviews, the driver stated that he was aware there were two men involved in the robbery and identified Hughes as one of the two men who robbed the pizzeria. The driver also gave additional information to the police; namely, the driver indicated that he worked with both Hughes and Harris and that Harris drove a particular vehicle that was registered to an address near the pizzeria. Each of these details were confirmed by the police. Police also viewed Hughes' social media profile online where they confirmed that he matched the physical description provided by the store employees at the pizzeria.

13

The detective was also aware that, in regard to the traffic stop in which the driver was arrested, the vehicle that was stopped matched the description given to the police and that a full inventory of the car revealed the presence of a number of items that had been described by the victims as having been used in the robbery, including an Iron Man mask, a black ski mask, brass knuckles, and a revolver. All of this information was at the disposal of the detective when he applied for the arrest warrant for Hughes.[6]

As our Supreme Court has noted,

'[P]robable cause' means [f]acts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense. So, when a court considers whether an officer had probable cause to arrest a suspect, the court must focus on the facts and circumstances then known to the officer, and it must inquire whether those facts and circumstances could lead a prudent

---

[6] At the hearing on Hughes' motion for new trial, the detective stated that there "was a plethora of information that came from [the driver] that corroborated a lot of the circumstantial stuff that we had found up to that point, which led me to the probable cause to obtain the arrest warrant for armed robbery. The fact that [the driver] identified specific key elements of vehicles, people, their statements, and the items that were found in the car, led me to believe that those people were in fact in the vehicle."

14

person—that is, a reasonable officer—to conclude that the suspect probably has committed an offense.

*Hughes v. State*, 296 Ga. 744, 748-49 (2) (770 SE2d 636) (2015) (citations omitted).

In this case, the body of evidence compiled by the detective before applying for a warrant for Hughes' arrest satisfied the State's minimal burden of establishing probable cause sufficient for the warrant to issue, as there were numerous items of evidence which, when considered together, would lead a reasonable officer to believe that Hughes had been involved in the robbery of the pizzeria. Because any motion to suppress evidence gleaned after Hughes' arrest would have therefore been meritless, counsel was not deficient in failing to seek suppression of the buccal swabs. *See Burrell v. State*, 301 Ga. 21, 25 (2) (799 SE2d 181) (2017) (no showing of deficiency where defendant cannot show that motion to suppress would have been successful). Hughes has therefore failed to establish that he received ineffective assistance of counsel under *Strickland*.

3. Harris argues that he received ineffective assistance of counsel because his trial counsel did not adequately investigate his case and, as a result, failed to call a witness that could have established an alibi for him. We disagree.

15

At the hearing on Harris's motion for a new trial, Harris's mother testified that she had been in regular contact with Harris's trial counsel. She further explained that she had told his trial counsel that Harris had been at her house until 11:00 pm on the night of the incident and that she could provide an alibi for him. According to his mother, trial counsel responded, "[W]ho's going to believe his mommy?"

In her testimony, Harris's trial counsel stated that she spoke to both Harris and his mother about the possibility of the mother testifying. She said that Harris told her, "[Y]ou're not getting my mom involved in this. She's not–I'm telling you do not call her as a witness. Do not call her as a witness, period." Trial counsel stated that Harris reiterated this concern to her several times.

Trial counsel also testified that she thought there were potential problems with the mother's testimony. The mother's testimony established that the mother's house was 2.1 miles from the pizzeria that was held up by Harris and Hughes. Trial counsel stated her concern that because of the proximity between the house and the restaurant, if the mother's timeline of events was only a few minutes off, the incident could have transpired just as alleged by the State. These concerns, along with direction from Harris not to call his mother as a witness, led trial counsel not to call the mother as a witness.

16

At the hearing on Harris' motion for a new trial, Harris denied that he had ever instructed trial counsel not to call his mother as a witness. He stated in his testimony that he was "fine with" his mother testifying.

At both the motion hearing and now on appeal, Harris argued that his trial counsel should have called his mother testify and that any issues relating to her credibility or the reliability of her timeline should have been questions for the jury to resolve. Harris essentially argues that, because of the limited evidence in the State's case identifying Harris as one of the perpetrators, presentation of a credible alibi would likely have changed the outcome of the trial as to Harris.

However, even if such evidence could have been helpful to Harris, his trial counsel articulated two reasonable concerns which led her not to call the mother to testify: concerns about the credibility and reliability of the mother's testimony and what trial counsel understood to be explicit instructions on the part of Harris not to call the mother to testify. The trial court determined that counsel's decision not to call the mother as a witness was made in the exercise of reasonable professional judgment, and we agree.

Our cases under *Strickland* grant trial counsel wide latitude in pursuing a range of trial strategies, especially as it relates to what witnesses to call on the defendant's

17

behalf. Decisions based on counsel's reasonable trial strategy do not constitute deficient performance, and "this Court does not evaluate trial counsel's tactics and strategic decisions in hindsight." *Fielding v. State*, 278 Ga. 309, 311 (3) (602 SE2d 597) (2004). Here, in addition to a more general concern about calling a defendant's mother to testify on his behalf, trial counsel was clearly concerned that the mother's version of events might not be reliable, given the close proximity of the pizzeria to her home. A decision not to call an alibi witness under these circumstances is a clear matter of trial strategy, and we will not second guess it on appeal. *See Upton v. Parks*, 284 Ga. 254, 257-58 (2) (664 SE2d 196) (2008) (counsel was not deficient in failing to call two potential alibi witnesses where counsel was concerned about witnesses' credibility).

Moreover, trial counsel testified that she was repeatedly instructed by Harris not to call the mother to testify. Although we generally require the trial counsel, not the client, to make final decisions regarding the calling of certain witnesses or the presentation of particular evidence,[7] when the attorney's decision aligns with what he or she perceived at the time to be the client's wishes in regard to calling a

---

[7] *See Reid v. State*, 235 Ga. 378, 379 (1) (219 SE2d 740) (1975) ("The decisions on what witnesses to call . . . and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client.")

18

particular witness, the attorney's decision should be given considerable deference in considering whether counsel's performance was deficient. *See Walls v. State*, 233 Ga. App. 601, 604-05 (5) (504 SE2d 471) (1998) (counsel was not deficient in failing to call alibi witness where defendant instructed counsel not to call witness).

On the record before us, we cannot say that the performance of Harris's trial counsel was deficient. Harris has therefore failed to establish that he received ineffective assistance of counsel under *Strickland*.

*Judgment affirmed. McFadden, P. J., and Branch, J., concur*.